IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon Ranch, LLC, an Arizona limited liability company, f.k.a. Grand Canyon West Ranch, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Sally Jewell, Secretary, United States Department of Interior; Mike Pool, in his official capacity as the Acting Director of the Bureau of Land Management; and Mohave County, an Arizona political subdivision,<br><br>Defendants. | No. CV-03-02496-PHX-NVW<br><br>**ORDER** |

Before the Court is Plaintiff's Application for Preliminary Injunction, etc., (Doc. 177), and related filings (Docs. 178, 186, 193, 198, and 213). For the following reasons, certain construction activities on the New Diamond Bar Road will be temporarily restrained until October 29, 2013, at which time the Court will have a further hearing to determine whether a preliminary injunction is necessary. This order states the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(2) of the Federal Rules of Civil Procedure.

**I.    FINDINGS OF FACT**

**A.    Background**

Grand Canyon Ranch is a western hospitality ranch owned and operated by Grand Canyon Ranch LLC, of which Nigel Turner is the principal owner. It spans 1,200 acres

in Mohave County, Arizona, and holds grazing permits from the Bureau of Land Management ("BLM") over an additional 105,000 acres of surrounding property. It caters to tourists interested in ranch activities, such as horseback rides, buffalo safaris, and helicopter tours of the Grand Canyon. It also conducts cattle and ranching operations and provides helicopter transportation between its property and Las Vegas.

In 1974, Grand Canyon Ranch's predecessor dedicated a right-of-way and easement to Mohave County for the use of a dirt road running across its property. The easement was part of the Old Diamond Bar Road, which provided access to the Western Rim of the Grand Canyon and Hualapai Indian Reservation. In the early 1990's, the Hualapai Tribe sought federal funds from the Tribal Transportation Program to improve the Diamond Bar Road to facilitate access to a tourist facility the tribe was constructing along the Western Rim. The tribe's facility competes with Grand Canyon Ranch for tourist business.

The United States began examining ways to improve the road, and to that effect, the BLM issued a Final Environmental Impact Statement, which contemplated that the Bureau of Indian Affairs ("BIA") would construct the new road over the general path of the existing road. The preferred route identified by the BLM had the new road crossing Grand Canyon Ranch several hundred yards south of where of the old road crossed its property. The government tried to obtain an easement from Grand Canyon Ranch to relocate the road, but negotiations between Grand Canyon Ranch, the BLM, and the BIA were initially unsuccessful.

On December 4, 2003, the BLM issued a Record of Decision granting the BIA a right of way across BLM land and approving construction of the new road. Grand Canyon Ranch appealed the BLM's decision and filed a separate suit against Mohave County and the United States government challenging the validity of the easements executed by its predecessor. The parties reached a settlement in 2007 (the "Settlement Agreement") (Doc. 118-2), which granted the United States a new easement across Grand Canyon Ranch's property to construct, operate, and maintain a new road. In exchange

1 for an easement across the property, the United States agreed, among other things, to construct certain amenities, including at least three underpasses for "cattle/horse and rider," with one underpass being located on ranch property.  The United States also agreed to build an entrance to the Ranch from the road, with acceleration lanes, turning lanes, signage, and cattle guards.  In addition, Mohave County agreed to abandon any prior easement it held for the old road four years after Grand Canyon Ranch conveyed an easement for the new road.  The parties agreed that the United States District Court for the District of Arizona would retain jurisdiction to enforce the settlement.

But the United States government did not directly undertake construction of the road.  Instead, a contract was executed with the Hualapai Tribe for the BIA to provide grant funding and technical assistance in designing the road.  The Hualapai Tribe was given the authority to seek bids, award contracts, and oversee construction, but was required to construct the road in accordance with the specifications outlined by the BIA.  The finished road would be a contract deliverable to the BIA, meaning it would need to be inspected and approved by the BIA before the federal government accepted the road.

### B. First Request for a Preliminary Injunction

Funding for the road was delayed, and it was not until 2012 that the Hualapai Tribe concluded it had sufficient funds to complete the segment of the road that crossed Grand Canyon Ranch's property.  The tribe solicited bids and awarded the construction contract to Fann Contracting, Inc.  Construction progressed, and Grand Canyon Ranch quickly became concerned that the tribe did not intend to construct the amenities promised in the Settlement Agreement.  In May 2013, Grand Canyon Ranch filed an Emergency Motion to Reopen Case (Doc. 115) (which was granted on May 15 and July 1, 2013 (Doc. 121, 162)), and an Emergency Motion for Enforcement of Settlement Agreement (Doc. 116), which it amended to explicitly seek a temporary restraining order and to schedule a preliminary injunction hearing.  Those motions alleged, among other things, that the construction plans did not include the amenities required by the Settlement Agreement.  The Hualapai Tribe was not brought into those motions, as it was

not a party to the original action in 2003, and the Settlement Agreement is with the United States.

After those motions were filed, relations between the government parties, Fann Contracting, the Hualapai Tribe, and Grand Canyon Ranch grew more contentious. Under the Settlement Agreement, the County abandoned its easement over the old road in 2011, but, because the new road was not complete, the public continued to use the old road after the easement had expired. In May 2013, after the motion to reopen proceedings and enforce the Settlement Agreement, Grand Canyon Ranch erected a toll booth on its property over the old road and started charging tourists an "admission fee" for passage. In response, Defendants began building a temporary bypass road ("Bypass Road") within the meets and bounds of the easement for the new road. The Bypass Road allowed traffic to bypass the toll booth while the new road was under construction. Grand Canyon Ranch responded by closing the old road altogether, blocking nearly all traffic from crossing through its property.

Grand Canyon Ranch then filed its First Amendment to Motion for Temporary Restraining Order and to Set Hearing for Motion for Preliminary Injunction (Doc. 127), arguing (1) that the Bypass Road violated its property rights, (2) that traffic on the temporary road irreparably harmed its hospitality operations, which are adjacent to the construction, (3) that drainage from the Bypass Road was damaging its property, and (4) that the construction plans failed to address the amenities agreed to as part of the Settlement Agreement. The injunction was denied because the Court concluded that Grand Canyon Ranch failed to show that any drainage-related harm from the Bypass Road could be prevented by a preliminary injunction, as the road grading was already constructed. Grand Canyon Ranch also failed to show that the Bypass Road violated any property rights or that the existing plans failed to address the amenities promised in Settlement Agreement. (Doc. 164). Evidence presented on this Application for a Preliminary Injunction, however, shows the Court misunderstood the construction plans at that time.

### C. This Application for a Preliminary Injunction

After injunctive relief was denied, relations between the parties deteriorated further. Claiming an oil spill, Grand Canyon Ranch cut off the water supply Fann Contracting needed for construction, forcing Fann Contracting to slow its progress. After a short time, Grand Canyon Ranch allowed Fann Contracting to access the water again but disagreements over the construction continued. On August 20, Grand Canyon Ranch filed this Application for Preliminary Injunction, etc., arguing (1) that the Bypass Road did not meet highway safety standards and was hazardous to drivers; (2) that the amenities, including the cattle and horse underpasses, were not being constructed according to the Settlement Agreement; and (3) that the new road's permanent drainage plan threatened its property. (Doc. 177). A little over a week later, Hualapai Tribal Police arrested Mr. Turner for trespassing off-reservation on BLM property where Grand Canyon Ranch holds a grazing lease and he had a right to be. No charges followed, but the incident suggested a possible breach of the peace and lapse of proper law enforcement. On September 3, 2013, Fann Contracting resumed working with heavy equipment and preparing for blasting activities, raising the possibility that construction activities were being sped up in an attempt to complete certain projects before a court hearing. The Court then set a hearing on the merits of an injunction for September 25, 2013, one week after a scheduled mediation (that proved unsuccessful). (Doc. 194).

At the September 25 hearing, the parties planned to execute a settlement agreement concerning use of the Bypass Road and the old road. Accordingly, Grand Canyon Ranch limited its request for injunctive relief to problems stemming from the amenities promised in the Settlement Agreement and the drainage from the new road. Plans submitted by Grand Canyon Ranch, and testimony from the Government's witnesses, show the original construction plans completely disregarded the amenities required by the Settlement Agreement and that, despite this suit having been filed over three months ago, the plans were not amended to include a version of the required amenities until late August. Despite the modifications, Grand Canyon Ranch's request

for relief also persists because the underpasses, turn lanes, entrances, and exits outlined in the amended plans do not comply with the Settlement Agreement.

At the time of the hearing, the only installed "cattle/horse and rider" underpass did not meet the specifications of the Settlement Agreement. The underpasses are necessary to allow wildlife, cattle, and horses to traverse the road without crossing traffic. The currently constructed underpass is a corrugated metal pipe, 138 inches in diameter. Grand Canyon Ranch's expert testified persuasively that the corrugated pipes do not meet the U.S. Department of Transportation Federal Highway Administration's Equestrian Design Guidebook for Trails, Trailhead, and Campgrounds Standards and that corrugated pipes as built and intended are inadequate for both cattle and horse and rider underpasses. Defendants confirmed they intend to install similar pipes for the two other underpasses and pave the bottom of each pipe with asphalt to create a five-foot-wide walkway. Although the five-foot walkway gives sufficient vertical clearance for a horse and rider, the narrow path, combined with the curved walls of the pipe, creates a circumscribed space with little leeway for horizontal movement. The design leaves no room for additional maneuvers should an animal spook or trip, creating a serious safety hazard. This hazard is magnified by the asphalt paving along the bottom, which Grand Canyon Ranch's expert convincingly testified is not an appropriate foothold for animals, especially shod horses.

The Government's testimony that other similar configurations are used as horse underpasses is unpersuasive and is rejected. The only photographic example the Government offered in support of its contention—a horse and rider underpass at Papago Park, Phoenix, Arizona, is patently different in every material respect. It is a half-pipe construction, with an earth footing surface the same width as the diameter of the pipe used, creating a wide pathway with a safe foothold. It is difficult to understand how the Government could offer that photograph as an example of what it has built and plans to build in this case.

1        Additionally, the grade on the approach to the underpass is seventeen percent. This greatly exceeds the maximum five percent grade permitted by the Department of Transportation Federal Highway Administration's Equestrian Design Guidebook for Trails, making it unsafe for horse and rider, especially a horse bearing an inexperienced rider, as might be expected at a guest ranch. Furthermore, the single horse and rider underpass that has been installed discharges horse and rider into a depression that will pond in rainy weather, thus impairing entry into or exit from the underpass. The Government objects that it would be costly to construct the safe approaches necessary to make the underpasses actually usable. This is an implicit concession that the Government is not planning, and never has planned, to construct the underpasses that good faith requires. Because the road over the underpass has not yet been paved, these defects can be cured in the course of planning an alternative underpass.

        Along with defects in the underpasses, the evidence presented shows that the promised turn lanes, entrances, and exits leading to Grand Canyon Ranch's property were missing from the original plans and that the updated plans do not account for Grand Canyon Ranch's current configuration, which has expanded since the time of the Settlement Agreement. If a remedy for these defects is not provided before the road is paved, the immense cost of tearing up paved road will render injunctive relief prohibitively expensive.

        Finally, Grand Canyon Ranch produced convincing evidence that the drainage plan for the permanent road would increase the flow of water onto its property, alter the natural water flow in the area, and likely damage the old road and ranch facilities. The new road alignment runs along the wash, and to save the expense of piping the waters further under the road to replicate the natural flow, the drainage plan under-crosses the new road at the shortest place and casts the water onto the ranch improvements. Water that currently runs into a wash below ranch improvements would be diverted into the wash above ranch improvements.

1   Moreover, in direct response to the scheduling of the injunction hearing, the BIA prepared a new drainage plan two days before the September 25 hearing. Grand Canyon Ranch had not even received the new drainage plan by the time of the hearing. When ruling on Grand Canyon Ranch's First Amendment to Motion for Temporary Restraining Order (Doc. 127) in June, the Court denied relief, in part, because it believed the drainage plan was established and could not be reasonably altered.  It became clear at the September 25 hearing, however, that Defendants did not have a drainage plain in place in June and had only just developed the drainage plan in September.  The Government concedes that the drainage plan is not fully implemented and could still be modified.  If the deficits in the drainage plan are not corrected before the new road is paved, entire sections of the road will need to be torn up, multiplying the costs to repair the defects. Any remedy must be provided before further construction takes place.

### III.    CONCLUSIONS OF LAW

Preliminary injunctive relief preserves the status quo pending a determination of the action on the merits.  *King v. Saddleback Junior Coll. Dist.*, 425 F.2d 426, 427 (9th Cir. 1970).  The standard for issuing a temporary restraining order is essentially the same as that for a preliminary injunction.  A movant must demonstrate (1) a likelihood of success on the merits, (2) a strong probability of suffering irreparable harm in the absence of preliminary relief, (3) a balance of equities in the movant's favor, and (4) consistency of this injunction with the public interest.  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 19 (2008); *National Meat Ass'n v. Brown,* 599 F.3d 1093, 1097 (9th Cir. 2010); *see also Beardslee v. Woodford,* 395 F.3d 1064, 1067 (9th Cir. 2005).  The burden of persuasion is on the movant, who must make "a clear showing." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam).  The "greater the relative hardship to the moving party, the less probability of success must be shown."  *Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999).

### A.     Plaintiff Is Likely to Succeed on the Merits

Grand Canyon Ranch has made a clear showing that it is likely to prevail on its claim that the underpasses and other planned amenities do not comply with the Settlement Agreement. It has also offered convincing proof that the planned drainage system is likely to harm its property in serious ways.

### B.     Plaintiff Will Suffer Irreparable Harm Without Injunctive Relief

Without injunctive relief, Grand Canyon Ranch will suffer irreparable harm because once the new road is paved, changes to the underpasses and drainage system will become prohibitively expensive. Defective underpasses and excess drainage would seriously jeopardize ranching activities and pre-existing structures. If pavement of the road is completed before the defects are addressed, Grand Canyon Ranch will never obtain compliant amenities or a modified drainage system. Allowing the construction to proceed without remedying the underlying defects would subject Grand Canyon Ranch to gross injustice.

### C.     Balance of Equities Favors the Plaintiff

Neither party has behaved admirably in this action. Grand Canyon Ranch is justifiably upset by the omissions and errors in construction, but it has chosen, on multiple occasions, to intentionally escalate and exacerbate the conflict. It erected a toll booth over its road when no alternative route was available to drivers, essentially forcing construction of the Bypass Road; it blocked the road entirely for a time, seriously disrupting traffic in the area; and it shut off the water supply to Fann Contracting with thin justification, forcing the contractor to delay certain projects. Grand Canyon Ranch's antagonizing behavior, however, does not rid Defendants of their obligations under the Settlement Agreement.

The disputed portion of the road is built on an easement granted to the United States by a private land owner with explicit obligations to the dominant estate. The United States cannot abdicate its responsibility for its easement or its obligations under the Settlement Agreement by delegating the construction of the road to the Hualapai

1 Indian Tribe. Even if the amenities had not been intentionally excluded from the original
2 plan, Defendants were on notice the plans were deficient when this action was filed in
3 May, but still took more than three months to add the required amenities. Defendants
4 have failed in their obligations to honor the Settlement Agreement and to ensure
5 construction proceeds in a way that protects the rights of the easement grantor. The
6 balance of equities favors Grand Canyon Ranch.

### D. Temporarily Restraining the Construction is in the Public Interest

Temporarily restraining the road construction serves the public interest by ensuring the government does not disregard property rights. The costs of temporarily staying road construction are minor compared to the costs of reconstruction later.

### E. Nature of Relief

Because Grand Canyon Ranch has demonstrated that it is likely to suffer permanent and irreparable harm if a portion of the New Diamond Bar Road construction is not restrained, a temporary and limited restraining order will issue against Defendants. Although it was initially contemplated that any relief granted after the September 25 hearing would take the form of a preliminary injunction, evidence showed that a decision on preliminary injunctive relief should be deferred. This temporary restraining order does not function as a final ruling on the merits, but, instead, preserves the status quo until preliminary injunctive relief can be more fully considered at a hearing set for October 29, 2013. *See Northern Stevedoring & Handling Corp. v. Int'l Longshoremen's & Warehousemen's Union, Local No. 60*, 685 F.2d 344, 347 (9th Cir. 1982) (holding that a temporary restraining order is equivalent to a preliminary injunction only if it "decides the merits of a case").

This order will only halt construction that will make it difficult to adjust the underpasses, entrance amenities, or drainage system and will last only until the harms can be more fully adjudicated at the hearing set for October 29. While the restraining order is in place, no paving is to occur over or within one hundred feet of any of the three underpasses, over any areas adjacent to Grand Canyon Ranch's improvements, or over

any portion of the road that would make it more difficult to modify the disputed drainage system. That is, no paving is to occur between the existing disputed culvert and where the water it now diverts would enter the wash downstream if there were no diversion. This limited portion of the construction will be enjoined only until October, 29, 2013, when a preliminary injunction hearing will be held to consider the precise terms of underpass construction and the disputed drainage construction.

IT IS THEREFORE ORDERED that this temporary restraining order shall bind the Defendants and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with them and who receive actual notice of this order, whether by service of process or otherwise.

IT FURTHER IS ORDERED that, until October 29, 2013, or otherwise agreed by the parties, (a) Defendants are temporarily restrained from installing any new cattle and horse underpasses, or cattle/horse and rider underpasses; (b) Defendants are temporarily restrained from paving the new road over or within one hundred feet of any underpasses and from paving any area between the existing disputed culvert and where the water it now diverts would enter the wash downstream if there were no diversion; and (c) Defendants are temporarily restrained from paving areas of the New Diamond Bar Road adjacent to Grand Canyon Ranch's improvements;

IT IS FURTHER ORDERED that, on or before 5:00 p.m. on October 15, 2013, Plaintiff shall submit to Defendants its proposed locations and specifications for the cattle and horse underpasses, entrances, and turn lanes provided for under the Settlement Agreement, and any comment on Defendants' drainage studies, reports, and plans ("Plaintiff's Proposals");

IT IS FURTHER ORDERED that, on or before 5:00 p.m. on October 21, 2013, Defendants shall respond to Plaintiff's Proposals with Defendants' comments and/or alternative locations and/or specifications ("Defendants' Proposals");

IT IS FURTHER ORDERED that the parties' respective engineering experts shall meet in person on or before October 23, 2013, to discuss and, in good faith, attempt to

resolve any differences in Plaintiff's Proposals and Defendants' Proposals. The meeting may not be attended by more than one representative each from the Hualapai Tribe and Fann Contracting, Inc., or the Defendants;

IT IS FURTHER ORDERED that the parties' respective principals and engineering experts shall meet in person on October 24 or 25, 2013, to discuss and, in good faith, attempt to resolve any remaining differences in the Proposals;

IT IS FURTHER ORDERED setting a hearing on the application for preliminary injunction on October 29, 2013, at 9 a.m. to address any remaining disputes between the parties related to the locations and objective professional construction standards for: (a) the drainage studies, plans, reports, construction, and culverts as they may impact Plaintiff's property; (b) the cattle and horse and/or cattle/horse and rider underpasses as provided for in the Settlement Agreement; and (c) the turn lanes and entrances on Plaintiff's property as provided for under the Settlement Agreement;

IT IS FURTHER ORDERED that, pursuant to Rule 65(c), this temporary restraining order is conditioned upon Plaintiff posting a bond of $50,000.00 to cover the costs and damages incurred by Defendant if Defendant is found to have been wrongly restrained.

Dated this 11th day of October, 2013 at 4:45 p.m. in Phoenix, Arizona.

_____
Neil V. Wake
United States District Judge